# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# MIDLAND DIVISION

| | |
|---|---|
| BOCA RATON FIREFIGHTERS' AND POLICE PENSION FUND, Derivatively on Behalf of PROPETRO HOLDING CORP.,<br><br>Plaintiff,<br><br>vs.<br><br>SPENCER D. ARMOUR III, MARK S. BERG, ANTHONY BEST, PRYOR BLACKWELL, ALAN E. DOUGLAS, PHILLIP A. GOBE, JACK B. MOORE, DALE REDMAN, STEVEN BEAL, SCHUYLER E. COPPEDGE, STEPHEN HERMAN, MATTHEW H. HIMLER, ROYCE W. MITCHELL, PETER LABBAT, JEFFREY SMITH and IAN DENHOLM,<br><br>Defendants,<br><br>– and –<br><br>PROPETRO HOLDING CORP., a Delaware corporation,<br><br>Nominal Defendant. | Civil Action No. 7:20-cv-30 |
| | DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## INTRODUCTION

1.      This is shareholder derivative action on behalf of nominal defendant ProPetro Holding Corp. ("ProPetro" or the "Company") against its Board of Directors (the "Board") and certain of its current and former directors and officers for breach of fiduciary duty, unjust enrichment, and violations of the federal securities laws.[1]

2.      Based in Midland, Texas, ProPetro is an oilfield services company.  According to its public filings, the Company provides "hydraulic fracturing and other complementary services to leading upstream oil and gas companies engaged in the exploration and production . . . of North American unconventional oil and natural gas resources."

3.      In March 2017, ProPetro sold 25 million shares of its common stock at $14.00 per share in an initial public offering ("IPO"), raising approximately $175 million in net proceeds.  In the Company's offering documents, defendants represented that ProPetro's Board was prepared to "adopt a code of business conduct and ethics in connection with the completion of this offering" and assured investors that ProPetro would conduct quarterly reviews of its related-party transactions to ensure proper compliance.

4.      After the IPO and as 2017-2019 unfolded, defendants, through their public statements, strove to carefully curate a public image of ProPetro as a successful oil fracking services company with strong financial performance and solid prospects for future growth.  Towards this end, defendants represented that ProPetro enjoyed rapid revenue growth, improving profitability, and

---

[1]      Defendants are ProPetro's directors – Spencer D. Armour III, Mark S. Berg, Anthony Best, Pryor Blackwell, Alan E. Douglas, Phillip A. Gobe, Jack B. Moore and Dale Redman; ProPetro's former directors – Steven Beal, Schuyler E. Coppedge, Stephen Herman, Matthew H. Himler, Royce W. Mitchell and Peter Labbat; and ProPetro's former Chief Financial Officer (and now Chief Administrative Officer) and former Chief Accounting Officer – Jeffrey Smith and Ian Denholm, respectively (together, "defendants").

strong earnings per share and earnings per share growth in 2017, 2018 and 2019, stating, among

other things, that:

- "'We are pleased to report our first quarterly results following our recent IPO.  Our business performed very well during the quarter and our fleet remained fully utilized.'"

- "'Our business in the second quarter of 2017 continued to improve on the back of strong Permian Basin rig count growth and an undersupplied frac market, resulting in increased demand for our services.'"

- "'I am pleased to report that continued strength in activity in the Permian Basin and solid demand for our fully utilized frac fleet resulted in another quarter of solid growth and financial performance for ProPetro.'"

- "'2017 was clearly the most transformational year in the Company's history from both an operational and financial perspective. . . .  I am pleased to report we are off to a strong start for 2018 and anticipate another outstanding year for ProPetro.'"

- "'I am pleased to report that our business is off to a great start in 2018. . . .  We are especially encouraged by the continued strength in activity in the Permian Basin and strong demand for our fully utilized frac fleet.'"

- "'Our success during the second quarter was a direct result of our continued collaboration with a blue-chip customer base that remains focused on driving efficiencies in their completion techniques coupled with the outstanding execution of our operations team. . . .  [W]e believe ProPetro is solidly positioned for continued success in this environment.'"

- "'ProPetro's success in the third quarter is a direct result of our differentiated, customer-centric business model. . . .  [W]e will remain closely focused on their needs as we finish 2018 strong and prepare for an exciting 2019.'"

- "'We are extremely proud of our results for 2018, and appreciate the outstanding efforts of our best-in-class team as they competed at the highest-level in what proved to be another pivotal year for the Permian Basin.'"

5.     Driven by the Company's purportedly strong financial results, the trading price of

ProPetro common stock advanced to as high as $24.66 per share on April 22, 2019 from $14.00 per

share on March 22, 2017.  But in August 2019, defendants' stately portrait of ProPetro as a fracking

success dissolved.

6.       On August 8, 2019, ProPetro filed a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") announcing that the Company needed to delay its second quarter report and earnings call due to an ongoing review by its Audit Committee concerning expense reimbursements, including $370,000 that was improperly reimbursed to senior management, and other transactions involving related parties or conflicts of interest.  The Company further revealed that the review concerned, among other things, expense reimbursements and certain transactions involving related parties or potential conflicts of interest, and that ProPetro expected to report a material weakness in its internal control over disclosures.

7.       Thereafter, on October 9, 2019, the Company filed a Form 8-K with the SEC stating that the "Company is continuing to review one or more related party transactions [that] . . . involve real estate transactions and do not involve any of the Company's current or former customers or vendors."  Moreover, the Company revealed that "the Audit Committee's internal review has identified a number of internal control deficiencies" and that, "[a]s a result of these internal control deficiencies, the Company's management is likely to conclude that there were one or more material weaknesses that resulted in the Company's internal control over financial reporting and disclosure controls and procedures not being effective as of a prior date."  More specifically, as to the internal control and disclosure deficiencies identified by the Company, the October 9, 2019 Form 8-K stated, in relevant part, as follows:

*Internal Controls and Disclosure Controls Deficiencies; Future Filings*

Although significant work has been completed and a number of control deficiencies are in the process of being remediated, management has not yet completed its evaluation of certain internal control deficiencies identified as a result of the internal review, ***but it is likely to conclude that there were one or more material weaknesses that resulted in the Company's disclosure controls and procedures not being effective***.  The Company expects to include additional information with respect to any identified material weaknesses in future filings with the SEC.

. . .  Management will also require additional time to evaluate the impact of any identified material weaknesses on the Company's prior filings.  *The Company's conclusions regarding any material weaknesses could result in a requirement to amend prior SEC filings.  In addition, the Company's independent registered public accounting firm will r*equire additional time in order to evaluate the internal review and associated findings, as well as the Company's proposed remediation plan and the impact that any identified material weaknesses may have on its prior opinions.

8.      Then, a few weeks later, on November 13, 2019, the Company filed a Form 8-K with the SEC revealing that "the Audit Committee has identified one related party transaction that was not previously disclosed" and "at least two material weaknesses that resulted in the Company's internal control over financial reporting and disclosure controls and procedures not being effective as of a prior date."  The previously undisclosed related-party transaction with ProPetro's now former Chief Accounting Officer, defendant Denholm, involved a business owned in part by defendant Denholm that had sold or leased a facility to ProPetro.  More specifically, the Company stated in the November 13, 2019 Form 8-K, in relevant part, as follows:

*Audit Committee Internal Review*

. . .  Since October 9, 2019, the Audit Committee **has identified one related party transaction that was not previously disclosed** and is described in greater detail below.

. . .  [T]he Audit Committee's internal review has identified a number of internal control deficiencies. As a result of these internal control deficiencies, the Company's management has concluded that **there were at least two material weaknesses that resulted in the Company's internal control over financial reporting and disclosure controls and procedures not being effective as of a prior date**. While management continues to evaluate the impacts of the identified control deficiencies, management has concluded that at least one of these material weaknesses existed as of December 31, 2018.

These determinations affect the conclusions regarding effectiveness previously expressed by the Company's management in Part II, Item 9A, "Controls and Procedures" in the Company's Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Annual Report") and Part I, Item 4, "Controls and Procedures" in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2019 (the "First Quarter 10-Q").  **Accordingly, investors should no longer rely on management's report on internal control over financial reporting or the internal control over financial reporting opinion of the Company's independent**

- 4 -

*registered public accounting firm included in the 2018 Annual Report.  The Company expects to amend the 2018 Annual Report and the First Quarter 10-Q in the future to reflect these conclusions.*

\*        \*        \*

The Company cannot currently predict when this evaluation and review process will be completed, but it does not currently expect to be in a position to file amended, delinquent or future SEC filings prior to the end of 2019.  The Company will continue to seek to complete the evaluation and review process, take appropriate corrective actions and make necessary filings with the SEC with a view to becoming current in its filing obligations under the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable.

*The Audit Committee identified one related party transaction that was not previously disclosed.  During 2018, (i) an entity ("Entity A") that is 50% owned by the Company's former Chief Accounting Officer* (the "Former CAO") and 50% by the Former CAO's business partner (who is not affiliated with the Company) loaned approximately $770,000, and (ii) an entity that is owned 100% by the Former CAO ("Entity B") loaned approximately $57,000, to another entity that is owned 100% by the Former CAO's business partner ("Entity C").  The loaned funds were used by Entity C during 2018 to pay for a portion of the acquisition, development, and construction costs associated with an iron testing facility and a portion of the acquisition and development costs associated with a maintenance facility that were sold or leased to the Company.  The approximately $827,000 of funds loaned by Entity A and Entity B to Entity C were repaid in full by Entity C, without interest.

Similarly, during 2019, Entity A provided approximately $500,000 of funds to Entity C, which funds the Company understands were used during 2019 to pay for a portion of the development and construction costs associated with the iron testing facility.

The Company purchased the iron testing facility from Entity C, reimbursed Entity C for certain development costs associated with the maintenance facility, and leased a property adjacent to the iron testing facility and the maintenance facility property from Entity C.  In total, the Company has paid approximately $3,600,000 to Entity C, which includes $2,300,000 associated with the iron testing facility discussed above.

9.      On this news, the trading price of ProPetro stock collapsed $10 per share, falling to $7.34 per share on November 13, 2019 from $17.34 per share on August 8, 2019, wiping out more than $950 million in once valuable shareholder equity.  Worse yet, the Company has been named as a primary defendant in a costly and expensive-to-defend class action lawsuit brought by ProPetro shareholders for alleged violations of the federal securities laws.  *See Logan v. ProPetro Holding*

*Corp.*, No. 19-cv-00217 (W.D. Tex.) ("Securities Class Action").  Moreover, due to defendants' faithless actions, ProPetro is now the subject of a costly and expensive SEC investigation into the Company's financial disclosures and reporting.

10.     Nevertheless, the ProPetro Board has not taken any legal action against the directors and officers responsible for this debacle.  Nor will they, because each of the defendants is interested in the outcome of any such legal action.  Accordingly, by this action, plaintiff seeks to vindicate ProPetro's interests against its wayward fiduciaries.  A pre-suit demand upon the ProPetro Board is excused in this case because at least a majority of the members of the ProPetro Board are disabled from fairly, independently and/or objectively considering such a demand.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78u-4).  This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

12.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

## PARTIES

14.     Plaintiff Boca Raton Firefighters' and Police Pension Fund is and continuously has been a shareholder of ProPetro since January 2018.  Plaintiff will adequately represent ProPetro's interests in the derivative claims asserted against defendants herein.

- 6 -

15.     Nominal defendant ProPetro Holding Corp. is a Delaware corporation with its principal executive offices located at 1706 S. Midkiff, Building B, Midland, Texas 79701. ProPetro common stock trades on the New York Stock Exchange under the ticker symbol "PUMP."

16.     Defendant Spencer D. Armour III ("Armour") has served as a director of ProPetro since 2013. Armour received at least $795,891 in fees and other incentive-based compensation not justified by the Company's performance while under his stewardship. Armour also sold 306,106 shares of ProPetro stock for insider trading proceeds of $5,359,738. Armour is a named defendant in the Securities Class Action.

17.     Defendant Mark S. Berg ("Berg") has served as a director of ProPetro since February 2019.

18.     Defendant Anthony Best ("Best") has served as a director of ProPetro since 2018. He also has served on the Audit and Compensation Committees of the ProPetro Board. Best received at least $176,984 in fees and other incentive-based compensation not justified by the Company's performance while under his stewardship.

19.     Defendant Pryor Blackwell ("Blackwell") has served as a director of ProPetro since 2017. He also has served on the Compensation and Nominating and Corporate Governance Committees of the ProPetro Board. Blackwell received at least $274,143 in fees and other incentive-based compensation not justified by the Company's performance while under his stewardship.

20.     Defendant Alan E. Douglas ("Douglas") has served as a director of ProPetro since 2017. He also has served on the Audit and Nominating and Corporate Governance Committees of the ProPetro Board. Douglas received at least $298,659 in fees and other incentive-based compensation not justified by the Company's performance while under his stewardship.

21.     Defendant Phillip A. Gobe ("Gobe") has served as a director of ProPetro since July 2019. He also has served as Executive Chairman of ProPetro since October 2019.

- 7 -

22.     Defendant Jack B. Moore ("Moore") has served as a director of ProPetro since 2017. He also has served on the Audit and Nominating and Corporate Governance Committees of the ProPetro Board.  Moore received at least $317,203 in fees and other incentive-based compensation not justified by the Company's performance while under his stewardship.

23.     Defendant Dale Redman ("Redman") has served as a director of ProPetro since 2005. He has also served as Chief Executive Officer of ProPetro since 2008.  Redman received at least $13,702,212 in cash, bonuses, stock awards, and other incentive-based compensation not justified by the Company's performance while under his stewardship.  Redman also sold 370,370 shares of ProPetro stock for insider trading proceeds of $5,185,180.  Redman is a named defendant in the Securities Class Action.

24.     Defendant Steven Beal ("Beal") served as a director of ProPetro from April 2017 until July 11, 2019.  He also served on the Audit and Compensation Committees of the ProPetro Board.  Beal received at least $322,106 in fees and other incentive-based compensation not justified by the Company's performance while under his stewardship.

25.     Defendant Schuyler E. Coppedge ("Coppedge") served as a director of ProPetro from 2013 to May 2018.  Coppedge is a named defendant in the Securities Class Action.

26.     Defendant Stephen Herman ("Herman") served as a director of ProPetro from March 2013 to December 2017.  Herman is a named defendant in the Securities Class Action.

27.     Defendant Matthew H. Himler ("Himler") served as a director of ProPetro from October 2016 to January 2018.  Himler is a named defendant in the Securities Class Action.

28.     Defendant Royce W. Mitchell ("Mitchell") served as a director of ProPetro from February 2019 to July 2019.  He also has served on the Audit Committee of the ProPetro Board.

29.     Defendant Peter Labbat ("Labbat") served as a director of ProPetro from 2013 to May 2018.  Labbat is a named defendant in the Securities Class Action.

30.     Defendant Jeffrey Smith ("Smith") served as Chief Financial Officer of ProPetro from 2005 to October 2019.  He currently serves as Chief Administrative Officer of ProPetro.  Smith received at least $7,559,216 in cash, bonuses, stock awards, and other incentive-based compensation not justified by the Company's performance while under his stewardship.  Smith also sold 222,221 shares of ProPetro stock for insider trading proceeds of $3,111,094.  Smith is a named defendant in the Securities Class Action.

31.     Defendant Ian Denholm ("Denholm") served as Chief Accounting Officer of ProPetro from August 2017 until October 3, 2019.  Denholm received at least $1,431,644 in cash, bonuses, stock awards, and other incentive-based compensation not justified by the Company's performance while under his stewardship.  Denholm is a named defendant in the Securities Class Action.

**THE FIDUCIARY DUTIES OF PROPETRO'S DIRECTORS AND OFFICERS**

32.     By reason of their positions as ProPetro directors and/or officers and because of their ability to direct and control the Company's business and corporate affairs, defendants owed ProPetro and its shareholders a fiduciary duty to use their utmost ability to control and manage ProPetro in an honest and lawful manner.  Toward that end, ProPetro's directors and officers owed the Company and its shareholders fiduciary duties to exercise candor, loyalty, good faith, and reasonable supervision over the Company's management, policies, practices, and internal controls.

33.     More specifically, as ProPetro's directors and officers, defendants' fiduciary duties required them to, among other things: (i) ensure that the Company complied with its legal obligations and requirements, including legal compliance with the corporations and federal securities laws, as well as acting only within the scope of legal authority and disseminating truthful and accurate statements to ProPetro shareholders; (ii) conduct the Company's affairs in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the Company's business, to avoid wasting the Company's assets, and to lawfully maximize the value of

- 9 -

the Company's shares; (iii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls; (iv) remain fully informed as to how ProPetro conducts its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the securities laws; (v) ensure that ProPetro was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations, including the corporations and securities laws; and (vi) refrain from breaching their fiduciary duties to the Company by adopting practices, procedures, and controls inconsistent with their fiduciary duties of care, candor, loyalty, and good faith.

34.      Further still, under the Charter of the Audit Committee of the ProPetro Board, the members of the Audit Committee are responsible for the Company's financial reporting processes and oversight of related-party transactions.  This includes, among other things, reviewing and approving ProPetro's annual and quarterly financial reports filed on SEC Forms 10-K and 10-Q and earnings press releases filed on SEC Form 8-K in conjunction with their release to ProPetro shareholders.  The Audit Committee Charter states, in part:

### I.      Purpose

The purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of ProPetro Holding Corp. (the "Company") in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's independent auditor; and (v) the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established.

\*      \*      \*

### III.      Meetings, Procedures and Authority

The Committee must meet at least once during each fiscal quarter. The Committee must periodically meet separately with management, with the independent auditor, with the Company personnel primarily responsible for the design and implementation of the internal audit function, and with the internal auditor (or other personnel responsible for the internal audit function) after the internal audit function has been established.

\*     \*     \*

## IV.     Duties and Responsibilities

\*     \*     \*

### *Annual Financial Statements and Annual Audit*

3.     *Audit Problems*.  The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4.     *Form 10-K Review*.  The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5.     *Audit Committee Report*.  The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

### *Quarterly Financial Statements*

6.     *Form 10-Q Review*.  The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### *Other Duties and Responsibilities*

7.     *Review of Earnings Releases*.  The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8.     *Risk Assessment and Risk Management*.  The Committee must discuss the Company's policies with respect to risk assessment and risk management.

\*     \*     \*

11.     *Reports to the Board of Directors*.  The Committee must report regularly to the Board regarding the activities of the Committee.

\*     \*     \*

14.     *Review of Related Person Transactions.*  The Committee must discuss with management and the independent auditor any related person transactions brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

15.     *Review of Code of Ethics and Conduct.*  The Committee must, at least annually, consider and discuss with management and the independent auditor the Company's Code of Ethics and Conduct and the procedures in place to enforce the Code of Ethics and Conduct. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code of Ethics and Conduct brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

35.     In committing the wrongful acts complained of herein, defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design.  In addition to the wrongful conduct complained of herein giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their fiduciary duties.

36.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such action to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS' UNLAWFUL SCHEME

37.     ProPetro is an oilfield services company that provides "hydraulic fracturing and other complementary services to leading upstream oil and gas companies engaged in the exploration and production . . . of North American unconventional oil and natural gas resources."

38.     On March 22, 2017, ProPetro completed the IPO of 25 million shares of its common stock, 13.250 million shares of which were sold by the Company and 11.750 million shares of which were sold by certain selling stockholders, including defendants Redman and Smith, at a price of

$14.00 per share pursuant to a Registration Statement on Form S-1 initially filed by ProPetro with the SEC on February 8, 2017.  In total, ProPetro raised approximately $175 million in net proceeds from the IPO to be used for, among other things, the purchase of additional hydraulic fracturing units and general corporate purposes.

39.     In the Registration Statement for the IPO, ProPetro represented that its Board was prepared to "adopt a code of business conduct and ethics in connection with the completion of th[e IPO]" and represented that ProPetro would conduct quarterly reviews of its related-party transactions to ensure proper compliance.  Regarding the Company's policy governing the review of related-party transactions, the Registration Statement represented, in relevant part, as follows:

> Our board of directors will adopt a code of business conduct and ethics in connection with the completion of this offering that will provide that the board of directors or its authorized committee will review on at least a quarterly basis all transactions with related persons that are required to be disclosed under SEC rules and, when appropriate, initially authorize or ratify all such transactions.  In connection with this offering, we will establish an audit committee consisting solely of independent directors whose functions will be set forth in the audit committee charter.  We anticipate that one of the audit committee's functions will be to review and approve all relationships and transactions in which we and our directors, director nominees and executive officers and their immediate family members, as well as holders of more than 5% of any class of our voting securities and their immediate family members, have a direct or indirect material interest.  We anticipate that such policy will be a written policy included as part [of] the audit committee charter that will be implemented by the audit committee and in the Code of Business Conduct and Ethics that our board of directors will adopt prior to the completion of this offering.

> The code of business conduct and ethics will provide that, in determining whether or not to recommend the initial approval or ratification of a transaction with a related person, the board of directors or its authorized committee should consider all of the relevant facts and circumstances available, including (if applicable) but not limited to: (i) whether there is an appropriate business justification for the transaction; (ii) the benefits that accrue to us as a result of the transaction; (iii) the terms available to unrelated third parties entering into similar transactions; (iv) the impact of the transaction on a director's independence (in the event the related person is a director, an immediate family member of a director or an entity in which a director or an immediate family member of a director is a partner, shareholder, member or executive officer); (v) the availability of other sources for comparable services; (vi) whether it is a single transaction or a series of ongoing, related

transactions; and (vii) whether entering into the transaction would be consistent with the code of business conduct and ethics.

40.    After the IPO, on May 10, 2017, defendants caused ProPetro to issue a press release announcing its financial results for the first quarter of 2017 ("1Q17"), ended March 31, 2017.  The press release, filed with the SEC on Form 8-K and disseminated to ProPetro shareholders, stated, in relevant part, as follows:

> ProPetro Holding Corp. ("ProPetro" or "the Company") (NYSE: PUMP) today announced financial and operational results for the first quarter of 2017.

> **First Quarter 2017 Highlights**

> - Total revenue for the quarter increased 96% to $171.9 million, compared to $87.9 million for the first quarter 2016.

> - Net loss for the quarter was $24.4 million, or $0.43 loss per diluted share including special items, as compared to a net loss of $12.9 million, or $0.37 loss per diluted share, for the first quarter 2016.

> - Adjusted EBITDA for the quarter was $16.2 million, up approximately 700% from $2.0 million for the first quarter 2016.

> - Completed the Company's Initial Public Offering (IPO), which generated net proceeds to ProPetro of $170.1 million.

> $*$      $*$      $*$

> According to data published by Baker Hughes Inc., the Permian Basin rig count, a significant driver of the Company's business, increased 21% from 264 at December 30, 2016 to 319 as of March 31, 2017.  This was a key factor in ProPetro maintaining 100% utilization of its fleet in the first quarter of 2017.  The Permian Basin rig count as of May 5, 2017 was 349, a 9% increase from the end of the first quarter.

> Dale Redman, Chief Executive Officer, commented, "We are pleased to report our first quarterly results following our recent IPO.  Our business performed very well during the quarter and our fleet remained fully utilized.  Our deep relationships and operational alignment with customers allowed us to further capitalize on the rapidly expanding rig count and strong demand for pressure pumping services in the Permian Basin.  Moreover, as a result of our IPO in March, we have secured the funding for four new-build pressure pumping fleets and ended the period with increased financial flexibility that will enable us to execute on our announced expansion initiatives and other opportunities to grow the business."

- 14 -

41.     On May 12, 2017, ProPetro filed its 1Q17 Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2017.  In the 1Q17 Form 10-Q, defendants reported that ProPetro enjoyed quarterly revenues of $171.9 million, a net loss of $24.3 million, and diluted earnings per share of ($0.43) per share.

42.     As to the effectiveness and status of the Company's internal controls over disclosures and financial reporting, the 1Q17 Form 10-Q continued, in relevant part, as follows:

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of March 31, 2017.

*Changes in Internal Controls over Financial Reporting*

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended March 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

43.     On August 8, 2017, defendants caused ProPetro to issue a press release announcing its financial results for the second quarter of 2017 ("2Q17"), ended June 30, 2017.  The press release, filed with the SEC on Form 8-K and disseminated to ProPetro shareholders, stated, in relevant part, as follows:

ProPetro Holding Corp. ("ProPetro" or "the Company") (NYSE: PUMP) today announced financial and operational results for the second quarter of 2017.

- 15 -

**Second Quarter 2017 Highlights**

- Total revenue for the quarter increased 24% to $213.5 million, compared to $171.9 million for the first quarter of 2017.

- Net income for the quarter was $4.9 million, or $0.06 per diluted share, as compared to a net loss of $24.4 million, or $0.43 loss per diluted share, for the first quarter of 2017.

- Adjusted EBITDA for the quarter was $30.7 million, up approximately 89% from $16.2 million for the first quarter of 2017.

- Frac fleet remained fully utilized, including deployment of two new build fleets, ending the period with total capacity of 510,000 hydraulic horsepower ("HHP") – more than a 20% increase as compared to the end of the first quarter of 2017.

- Recently took delivery and immediately commenced operations of an additional frac fleet bringing total deployed capacity to 555,000 HHP, with plans to build and deploy three incremental fleets by year end, bringing total frac fleet capacity to 690,000 HHP.

\*       \*       \*

Dale Redman, Chief Executive Officer, commented, "Our business in the second quarter of 2017 continued to improve on the back of strong Permian Basin rig count growth and an undersupplied frac market, resulting in increased demand for our services. The successful deployment of new equipment allowed us to further strengthen our relationships with customers who recognize our proven track record of unsurpassed operational execution. This unique industry position supports our view that we will continue to see strong demand for pressure pumping, and we are responding to the long-term needs of our customers through further expansion of our frac fleet capacity."

44.     On August 11, 2017, ProPetro filed its 2Q17 Quarterly Report on Form 10-Q with the SEC for the period ended June 30, 2017.  In the 2Q17 Form 10-Q, defendants reported that ProPetro enjoyed quarterly revenues of $213.4 million, net income of $4.9 million, and diluted earnings per share of $0.06 per share.

45.     As to the effectiveness and status of the Company's internal controls over disclosures and financial reporting, the 2Q17 Form 10-Q continued, in relevant part, as follows:

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report.  Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of June 30, 2017.

*Changes in Internal Control over Financial Reporting*

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

46.     On November 1, 2017, defendants caused ProPetro to issue a press release announcing its financial results for the third quarter of 2017 ("3Q17"), ended September 30, 2017. The press release, filed with the SEC on Form 8-K and disseminated to ProPetro shareholders, stated, in relevant part, as follows:

ProPetro Holding Corp. ("ProPetro" or "the Company") (NYSE: PUMP) today announced financial and operational results for the third quarter of 2017.

**Third Quarter 2017 Highlights**

- Total revenue for the quarter increased 32% to $282.7 million, compared to $213.5 million for the second quarter of 2017.

- Net income for the quarter was $22.0 million, or $0.25 per diluted share, as compared to $4.9 million, or $0.06 per diluted share, for the second quarter of 2017.

- Adjusted EBITDA for the quarter was $47.8 million, up 56% from $30.7 million for the second quarter of 2017. Adjusted EBITDA margin for the third quarter was 16.9% – a substantial increase from 14.4% in the preceding quarter.

- Frac fleet remained fully utilized, including deployment of three new-build fleets, ending the period with total capacity of 645,000 hydraulic horsepower ("HHP") – more than a 26% increase as compared to the end of the second quarter of 2017.

- Recently took delivery and immediately commenced operations of an additional frac fleet bringing total deployed capacity to 690,000 HHP. The Company plans to build and deploy one additional fleet in the first quarter of 2018, which will increase total frac fleet capacity to 735,000 HHP, or 17 fleets.

*       *       *

Dale Redman, Chief Executive Officer, commented, "I am pleased to report that continued strength in activity in the Permian Basin and solid demand for our fully utilized frac fleet resulted in another quarter of solid growth and financial performance for ProPetro. Our operations team did an excellent job of working closely with and serving the specific needs of our customers, who remain very efficient and collaborative. We will continue to focus on providing unparalleled performance and customer service as we prudently and methodically expand our unique platform in the Permian Basin."

47.     On November 2, 2017, ProPetro filed its 3Q17 Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2017.  In the 3Q17 Form 10-Q, defendants reported that ProPetro enjoyed quarterly revenues of $282.7 million, net income of $21.9 million, and diluted earnings per share of $0.26 per share.

48.     As to the effectiveness and status of the Company's internal controls over disclosures and financial reporting, the 3Q17 Form 10-Q continued, in relevant part, as follows:

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer, principal financial officer and principal accounting officer, the effectiveness of the design and operation of our disclosure controls and

procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of September 30, 2017.

*Changes in Internal Control over Financial Reporting*

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

49. On March 26, 2018, defendants caused ProPetro to issue a press release announcing its financial results for the fourth quarter of 2017 ("4Q17") and fiscal year 2017, ended December 31, 2017. The press release, filed with the SEC on Form 8-K and disseminated to ProPetro shareholders, stated, in relevant part, as follows:

ProPetro Holding Corp. ("ProPetro" or "the Company") (NYSE: PUMP) today announced financial and operational results for the full year and fourth quarter of 2017, and additional expansion of its fleet.

**Full Year 2017 Operational Highlights**

- Grew year-end fleet capacity by 64% to 690,000 hydraulic horsepower ("HHP"), or 16 fleets, from 420,000 HHP, or ten fleets, at the end of 2016;

- Maintained 100% fleet utilization throughout the year;

- Purchased 86 Tier 2 engines estimated to yield approximately $30 million in savings;

- Implemented and completed transition from carbon steel to stainless steel fluid ends;

- Expanded operations to the Delaware Basin, and

- Maintained safety and performance metrics while growing employee head count nearly 100%.

**Full Year 2017 Financial Highlights**

- Successfully completed initial public offering to fund growth initiatives and strengthen balance sheet;

- Increased total revenue by 125% to $981.9 million from $436.9 million in 2016;

- Reported net income of $12.6 million as compared to a net loss of $53.1 million in 2016; and

- Grew adjusted EBITDA to $137.4 million from $7.8 million in 2016 – more than a 1,600% increase.

**Fourth Quarter 2017 Highlights**

- Increased total revenue by 11% to $313.7 million from $282.7 million in the third quarter of 2017;

- Posted net income of $10.1 million and adjusted EBITDA of $42.8 million; and

- Deployed one new-build fleet (45,000 HHP).

*        *        *

Dale Redman, Chief Executive Officer, commented, "2017 was clearly the most transformational year in the Company's history from both an operational and financial perspective. Driving our results was a continued unwavering focus on exceeding the needs of our customers and working closely with our supply chain partners as we grew our best-in-class fleet without sacrificing safety or performance. I am incredibly proud of our team's accomplishments during the past year, which is a direct testament to the tireless efforts of our workforce. While our fourth quarter results were affected by a higher than originally anticipated amount of holiday time off, more vertical completion work than expected, and inclement weather, I am pleased to report we are off to a strong start for 2018 and anticipate another outstanding year for ProPetro."

(Footnote omitted.)

50.     On March 27, 2018, ProPetro filed its 2017 Annual Report on Form 10-K with the SEC for the period ended December 31, 2017.  In the 2017 Form 10-K, defendants reported that ProPetro enjoyed annual revenues of $981.8 million, net income of $12.6 million, and diluted earnings per share of $0.17 per share.

51.     As to the effectiveness and status of the Company's internal controls over disclosures and financial reporting, the 2017 Form 10-K continued, in relevant part, as follows:

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer, principal financial officer and principal accounting officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report.  Based upon that evaluation, our principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2017.

*Management's Report on Internal Control over Financial Reporting*

We are required to comply with the SEC's rules implementing Section 302 of the Sarbanes-Oxley Act of 2002, which requires our management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of our internal control over financial reporting.  We will not be required to make our first assessment of our internal control over financial reporting until the year of our second annual report required to be filed with the SEC.

Our independent registered public accounting firm is not yet required to formally attest to the effectiveness of our internal controls over financial reporting, and will not be required to do so for as long as we are an "emerging growth company" pursuant to the provisions of the JOBS Act.

*Changes in Internal Control over Financial Reporting*

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

52.     On May 8, 2018, defendants caused ProPetro to issue a press release announcing its financial results for the first quarter of 2018 ("1Q18"), ended March 31, 2018.  The press release, filed with the SEC on Form 8-K and disseminated to ProPetro shareholders, stated, in relevant part, as follows:

ProPetro Holding Corp. ("ProPetro" or "the Company") (NYSE: PUMP) today announced financial and operational results for the first quarter of 2018.

**First Quarter 2018 and Recent Highlights**

- Total revenue for the quarter increased approximately 23% to $385.2 million, compared to $313.7 million for the fourth quarter of 2017.

- Net income for the quarter was $36.7 million, or $0.42 per diluted share, as compared to $10.1 million, or $0.12 per diluted share, for the fourth quarter of 2017.

- Adjusted EBITDA for the quarter was $76.7 million, up 79% from $42.8 million for the fourth quarter of 2017.

- Frac fleet remained fully utilized, including deployment of two new-build fleets, and an additional 35,000 hydraulic horsepower ("HHP") into the legacy fleet. Period ending capacity was 815,000 HHP, or 18 fleets – more than a 18% [sic] increase as compared to 690,000 HHP at the end of the fourth quarter of 2017.

- In April took delivery and immediately commenced operations of an additional new-build frac fleet bringing total deployed capacity to 860,000 HHP, or 19 fleets.

- As previously announced, the Company plans to deploy one additional new-build fleet in the fourth quarter of 2018. This addition will increase total frac fleet capacity to 905,000 HHP, or 20 fleets.

\*     \*     \*

Dale Redman, Chief Executive Officer, commented, "I am pleased to report that our business is off to a great start in 2018. Through our best in class operations team and close collaboration with our customers, we avoided many of the headwinds that our sector faced in the first quarter. We are especially encouraged by the continued strength in activity in the Permian Basin and strong demand for our fully utilized frac fleet. We will continue to focus on executing at the wellsite to provide our customers with unmatched service as we help them harvest their respective resources in the most active onshore basin in the U.S."

53.     On May 9, 2018, ProPetro filed its 1Q18 Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2018.  In the 1Q18 Form 10-Q, defendants reported that ProPetro enjoyed quarterly revenues of $385.2 million, net income of $36.7 million, and diluted earnings per share of $0.42 per share.

- 22 -

54.     As to the effectiveness and status of the Company's internal controls over disclosures

and financial reporting, the 1Q18 Form 10-Q continued, in relevant part, as follows:

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer, principal financial officer and principal accounting officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer, principal financial officer and principal accounting officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of March 31, 2018.

*Changes in Internal Control over Financial Reporting*

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

55.     On August 7, 2018, defendants caused ProPetro to issue a press release announcing

its financial results for the second quarter of 2018 ("2Q18"), ended June 30, 2018.  The press release,

filed with the SEC on Form 8-K and disseminated to ProPetro shareholders, stated, in relevant part,

as follows:

ProPetro Holding Corp. ("ProPetro" or "the Company") (NYSE: PUMP) today announced record financial and operational results for the second quarter of 2018.

**Second Quarter 2018 and Recent Highlights**

- Total revenue for the quarter increased approximately 19% to $459.9 million, compared to $385.2 million for the first quarter of 2018.

- Net income for the quarter was $39.1 million, or $0.45 per diluted share, as compared to $36.7 million, or $0.42 per diluted share, for the first quarter of 2018.

- Adjusted EBITDA for the quarter was $96.0 million, up 25% from $76.7 million for the first quarter of 2018.

- Frac fleet remained fully utilized, including deployment of one new-build fleet during the quarter.  Period ending capacity was 860,000 HHP, or 19 fleets – more than a 5% increase as compared to 815,000 HHP at the end of the first quarter of 2018.

- As previously announced, the Company plans to take delivery of and deploy one additional fleet in the fourth quarter of 2018.  This addition will increase total frac fleet capacity to 905,000 HHP, or 20 fleets.

\*       \*       \*

Dale Redman, Chief Executive Officer, commented, "Our success during the second quarter was a direct result of our continued collaboration with a blue-chip customer base that remains focused on driving efficiencies in their completion techniques coupled with the outstanding execution of our operations team.  As we have discussed previously, we anticipate Permian completions to further evolve into a manufacturing approach for the foreseeable future. Through leveraging our proven business model and fully-utilized fleet, we believe ProPetro is solidly positioned for continued success in this environment."

56.   On August 9, 2018, ProPetro filed its 2Q18 Quarterly Report on Form 10-Q with the SEC for the period ended June 30, 2018.  In the 2Q18 Form 10-Q, defendants reported that ProPetro enjoyed quarterly revenues of $459.9 million, net income of $39.1 million, and diluted earnings per share of $0.45 per share.

57.   As to the effectiveness and status of the Company's internal controls over disclosures and financial reporting, the 2Q18 Form 10-Q continued, in relevant part, as follows:

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our

management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of June 30, 2018.

*Changes in Internal Control over Financial Reporting*

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

58.   On November 6, 2018, defendants caused ProPetro to issue a press release announcing its financial results for the third quarter of 2018 ("3Q18"), ended September 30, 2018. The press release, filed with the SEC on Form 8-K and disseminated to ProPetro shareholders, stated, in relevant part, as follows:

ProPetro Holding Corp. ("ProPetro" or "the Company") (NYSE: PUMP) today announced financial and operational results for the third quarter of 2018.

**Third Quarter 2018 and Recent Highlights**

- Total revenue for the quarter was $434.0 million, as compared to $459.9 million for the second quarter of 2018.

- Net income was $46.3 million, or $0.53 per diluted share, an increase of 18% from $39.1 million, or $0.45 per diluted share, for the second quarter of 2018.

- Adjusted EBITDA for the quarter was $103.4 million, an increase of 8% from $96.0 million for the second quarter of 2018.

- Active hydraulic horsepower ("HHP") deployed during the quarter and at quarter end was 860,000, or 19 fleets.

- The Company deployed one additional fleet in early October, increasing current total frac fleet capacity to 905,000 HHP, or 20 fleets.

- 25 -

*     *     *

Dale Redman, Chief Executive Officer, commented, "ProPetro's success in the third quarter is a direct result of our differentiated, customer-centric business model. We remain extremely proud of our best-in-class team and the consistent results they produce. Our team supports some of the most effective and efficient operators in the upstream space, and we will remain closely focused on their needs as we finish 2018 strong and prepare for an exciting 2019."

59.    On November 8, 2018, ProPetro filed its 3Q18 Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2018.  In the 3Q18 Form 10-Q, defendants reported that ProPetro enjoyed quarterly revenues of $434 million, net income of $46.3 million, and diluted earnings per share of $0.53 per share.

60.    As to the effectiveness and status of the Company's internal controls over disclosures and financial reporting, the 3Q18 Form 10-Q continued, in relevant part, as follows:

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of September 30, 2018.

*Changes in Internal Control over Financial Reporting*

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended September 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

61.     On February 26, 2019, defendants caused ProPetro to issue a press release announcing its financial results for the fourth quarter of 2018 ("4Q18") and fiscal year 2018, ended December 31, 2018.  The press release, filed with the SEC on Form 8-K and disseminated to ProPetro shareholders, stated, in relevant part, as follows:

> ProPetro Holding Corp. ("ProPetro" or "the Company") (NYSE: PUMP) today announced financial and operational results for the full year and fourth quarter of 2018.

> **Full Year 2018 Operational Highlights**

> - Organically grew legacy business year-end fleet capacity by 215,000 to 905,000 hydraulic horsepower ("HHP"), or 20 fleets, from 690,000 HHP, or 16 fleets, at the end of 2017.
>
> - Maintained industry-leading fleet utilization throughout the year.
>
> - Enhanced industry-leading safety and performance metrics while growing employee headcount over 50%
>
> - Entered into a strategic transaction for the acquisition of 510,000 HHP, or 8 fleets, from Pioneer Natural Resources ("Pioneer" or "PXD") and related 10-year dedicated service agreement . . . .

> **Full Year 2018 Financial Highlights**

> - Grew total revenue by 74% to $1.7 billion from $981.9 million in 2017.
>
> - Expanded net income by almost 14 times to $173.9 million, or $2.00 per diluted share, for 2018, from $12.6 million, or $0.16 per diluted share, in 2017.
>
> - Increased adjusted EBITDA to $388.5 million from $137.4 million in 2017 – more than 180% higher.

> **Fourth Quarter 2018 Highlights**

> - Total revenue was $425.4 million as compared to the $434.0 million in the third quarter 2018.
>
> - Grew net income to $51.8 million, a 12% increase from $46.3 million in the previous quarter.

- 27 -

- Adjusted EBITDA increased 9% to $112.4 million from $103.3 million in the third quarter.

- Deployed one new-build frac fleet 45,000 HHP, bringing total year-end HHP to 905,000.

- Closed transaction with Pioneer on December 31, 2018, bringing company-wide/total HHP to 1,415,000 HHP.

\*   \*   \*

Dale Redman, Chief Executive Officer, commented, "We are extremely proud of our results for 2018, and appreciate the outstanding efforts of our best-in-class team as they competed at the highest-level in what proved to be another pivotal year for the Permian Basin. As important, I want to thank our customers, supply chain partners, and other key stakeholders for their important contributions to our success. Underpinning our outperformance in 2018 was a resilient long-term model of providing unrivaled execution at the wellsite for the benefit of our customers, and we look forward to continued close collaboration in their ongoing efforts. Finally, we are very excited to have announced and closed on our strategic transaction and service agreement with Pioneer and would like to once again welcome all of our new teammates to the ProPetro team."

(Footnote omitted.)

62.     On March 1, 2019, ProPetro filed its 2018 Annual Report on Form 10-K with the SEC for the period ended December 31, 2018.  In the 2018 Form 10-K, defendants reported that ProPetro enjoyed annual revenues of $1.7 billion, net income of $173.8 million, and diluted earnings per share of $2.08 per share.

63.     As to the effectiveness and status of the Company's internal controls over disclosures and financial reporting, the 2018 Form 10-K continued, in relevant part, as follows:

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer, principal financial officer and principal accounting officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report.  Based upon that evaluation, our principal executive officer, principal financial officer and principal accounting officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2018.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). See page 48 for Management's Report on Internal Control Over Financial Reporting.  Deloitte & Touche LLP, an independent registered public accounting firm, has audited the effectiveness of our internal control over financial reporting as of December 31, 2018, as stated in their report, which is included herein. See page 50 for Report of Independent Registered Public Accounting Firm on its assessment of our internal control over financial reporting.

**Changes in Internal Control over Financial Reporting**

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

64.     On May 7, 2019, defendants caused ProPetro to issue a press release announcing its financial results for the first quarter of 2019 ("1Q19"), ended March 31, 2019.  The press release, filed with the SEC on Form 8-K and disseminated to ProPetro shareholders, stated, in relevant part, as follows:

ProPetro Holding Corp. ("ProPetro" or "the Company") (NYSE: PUMP) today announced financial and operational results for the first quarter of 2019.

**First Quarter 2019 Highlights**

- Total revenue for the quarter was $546.2 million, as compared to $425.4 million for the fourth quarter of 2018.

- Net income was $69.8 million, or $0.67 per diluted share, an increase of 35% from $51.8 million, or $0.59 per diluted share, for the fourth quarter of 2018.

- Adjusted EBITDA for the quarter was $150.3 million, an increase of 34% from $112.4 million for the fourth quarter of 2018.

- Effective utilization for the first quarter was 27.0 fleets.

- Plans to deploy two new-build electrically powered *DuraStim*® fleets in late 2019.

*       *       *

Dale Redman, Chief Executive Officer, commented, "ProPetro's success in the first quarter is yet another example of our differentiated, customer-centric and performance driven business model. We remain extremely proud of our best-in-class team and the consistent results they produce. I'm also proud to report that we've integrated approximately 500 employees from our Pioneer transaction and that they are already adding significant value as members of the ProPetro team. Our team continues to support some of the most effective and efficient operators in the upstream space, and we will remain closely focused on their needs as we execute plans for an exciting 2019."

(Footnotes omitted.)

65.    On May 8, 2019, ProPetro filed its 1Q19 Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2019.  In the 1Q19 Form 10-Q, defendants reported that ProPetro enjoyed quarterly revenues of $546.2 million, net income of $69.8 million, and diluted earnings per share of $0.67 per share.

66.    As to the effectiveness and status of the Company's internal controls over disclosures and financial reporting, the 1Q19 Form 10-Q continued, in relevant part, as follows:

*Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules

13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of March 31, 2019.

*Changes in Internal Control over Financial Reporting*

No changes in our system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the quarterly period ended March 31, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

67.     Driven by the Company's purportedly strong financial results, the trading price of ProPetro common stock advanced to as high as $24.66 per share on April 22, 2019 from $14.00 per share on March 22, 2017.  However, in early August 2019, defendants' scheme began to collapse.

68.     On August 8, 2019, ProPetro filed a Form 8-K with the SEC revealing that the Company needed to delay its second quarter report and earnings call due to an ongoing review by its Audit Committee concerning expense reimbursements, including $370,000 that was improperly reimbursed to senior management, and other transactions involving related parties or conflicts of interest.  More specifically, the Company revealed, in relevant part, as follows:

The Audit Committee (the "Committee") of the Company's board of directors (the "Board"), with assistance of independent outside counsel and accounting advisors, is in the process of conducting an internal review which initially focused on the Company's disclosure of agreements previously entered into by the Company with AFGlobal Corporation ("AFGlobal") for the purchase of Durastim® hydraulic fracturing fleets and effective communications related thereto. The review was later expanded to, among other items, review expense reimbursements and certain transactions involving related parties or potential conflicts of interest. Substantial work related to the review has been completed to date, and the Committee expects to complete its review within the next 30 days.  The Company is also in the process of implementing improvements to address certain findings identified to date in the review.

**Preliminary Committee Findings**

As previously announced by the Company on June 28, 2019, the Company entered into revised agreements with AFGlobal pursuant to which it agreed to purchase one additional Durastim® hydraulic fracturing fleet, in addition to its agreements to purchase two Durastim® hydraulic fracturing fleets that were entered into during the quarter ended March 31, 2019.  The Company also secured an option

to purchase up to three additional fleets exercisable through the end of 2020. These revised agreements amended and/or replaced previous contracts to purchase a total of six DuraStim® fleets, including four DuraStim® fleets that the Company committed to purchase in April 2019.

As part of its review of internal controls, the Committee identified, due to inadequate documentation associated with the Company's expense reimbursement practices, certain expenses reimbursed to members of senior management, including the chief executive officer and chief financial officer, that were incorrectly recorded as expenses of the Company and appropriately allocable to the officers individually. Each of these officers has reimbursed the Company in full for the identified amounts. The reimbursed amounts totaled approximately $370,000 since the Company's initial public offering in 2017. Of the total amounts, approximately $346,000 were attributable to the chief executive officer and approximately $18,000 were attributable to the chief financial officer.

Based on the review conducted to date, the Committee and management has not identified any failure to appropriately disclose related party transactions. The Committee and management have also not identified to date any items that would require revision or restatement of the Company's historical financial statements. However, the review is continuing and there is no assurance that additional items will not be identified. The Company does not intend to provide additional updates on the results of the review until it is concluded or the Company determines that further disclosure is appropriate or necessary.

**Preliminary Internal Controls and Disclosure Controls Findings**

The Company's management is evaluating certain internal control deficiencies identified to date as a result of the review. Management has not yet completed this process but is likely to conclude that certain internal control deficiencies, rising to a level of a material weakness, resulted in the Company's disclosure controls and procedures not being effective. In the course of the continuing review, management may identify additional deficiencies that rise to a level of a material weakness. The Company expects to include additional information regarding any definitive conclusion regarding a material weakness determination in its quarterly report on Form 10-Q for the quarter ended June 30, 2019 (the "Form 10-Q").

69.     On October 9, 2019, the Company filed a Form 8-K with the SEC stating that the

"Company is continuing to review one or more related party transactions [that] . . . involve real

estate transactions and do not involve any of the Company's current or former customers or

vendors." According to the Form 8-K, ProPetro's "management has not yet completed its evaluation

of certain internal control deficiencies identified as a result of the internal review, but it is likely to

conclude that there were one or more material weaknesses that resulted in the Company's disclosure controls and procedures not being effective" and that the "Company expects to include additional information with respect to any identified material weaknesses in future filings with the SEC." More specifically, the Company stated, in relevant part, as follows:

*Audit Committee Internal Review*

The Board's Audit Committee, with assistance of independent outside counsel and accounting advisors, has substantially completed fact finding associated with its internal review that was previously announced in a Current Report on Form 8-K filed with the Securities and Exchange Commission ("SEC") on August 8, 2019 (the "Original Form 8-K"). The Company is continuing to review one or more related party transactions. The related party transactions currently under review involve real estate transactions and do not involve any of the Company's current or former customers or vendors.

The Audit Committee and management have not identified to date any items that would require restatement of the Company's previously reported balance sheets, statements of operations, statements of shareholders' equity or statements of cash flows. However, the Audit Committee's internal review has identified a number of internal control deficiencies. As a result of these internal control deficiencies, the Company's management is likely to conclude that there were one or more material weaknesses that resulted in the Company's internal control over financial reporting and disclosure controls and procedures not being effective as of a prior date. These matters are discussed in greater detail below.

\*       \*       \*

*Internal Controls and Disclosure Controls Deficiencies; Future Filings*

Although significant work has been completed and a number of control deficiencies are in the process of being remediated, management has not yet completed its evaluation of certain internal control deficiencies identified as a result of the internal review, but it is likely to conclude that there were one or more material weaknesses that resulted in the Company's disclosure controls and procedures not being effective. The Company expects to include additional information with respect to any identified material weaknesses in future filings with the SEC.

As previously disclosed, due to the Audit Committee's review, the Company has not filed its quarterly report on Form 10-Q for the quarter ended June 30, 2019 (the "Form 10-Q") with the SEC. Although fact finding associated with the Audit Committee's review has been substantially completed, additional time will be required for new members of the Company's management team who are responsible for certifying the accuracy of the Company's financial information and the

effectiveness of the Company's disclosure controls and procedures to be in a position to so certify. Management will also require additional time to evaluate the impact of any identified material weaknesses on the Company's prior filings. The Company's conclusions regarding any material weaknesses could result in a requirement to amend prior SEC filings. In addition, the Company's independent registered public accounting firm will require additional time in order to evaluate the internal review and associated findings, as well as the Company's proposed remediation plan and the impact that any identified material weaknesses may have on its prior opinions.

The Company cannot currently predict when this evaluation process will be completed but will seek to complete the evaluation process, take appropriate corrective actions and make necessary filings with the SEC with a view to becoming current in its filing obligations under the Exchange Act as soon as reasonably practicable.

70.    A few weeks later, on November 13, 2019, ProPetro announced that it had uncovered material weaknesses in the Company's financial controls and an undisclosed related-party transaction with defendant Denholm, the Company's former Chief Accounting Officer. Reportedly, the Board had identified weaknesses in the Company's internal controls over financial disclosure and reporting, two of which were material weaknesses and at least one weakness that had existed since December 31, 2018. The previously undisclosed related-party transaction with defendant Denholm reportedly involved a business owned in part by defendant Denholm that had sold or leased a facility to ProPetro. More specifically, the Company stated, in relevant part, as follows:

*Audit Committee Internal Review*

The Audit Committee of the board of directors of the Company, with assistance of independent outside counsel and accounting advisors, has continued to review the matters previously disclosed in the Company's Current Reports on Form 8-K filed with the Securities and Exchange Commission ("SEC") on August 8, 2019 and October 9, 2019. Since October 9, 2019, the Audit Committee has identified one related party transaction that was not previously disclosed and is described in greater detail below.

The Audit Committee and management have not identified to date any items that would require restatement of the Company's previously reported balance sheets, statements of operations, statements of shareholders' equity or statements of cash flows. However, the Audit Committee's internal review has identified a number of internal control deficiencies. As a result of these internal control deficiencies, the Company's management has concluded that there were at least two material weaknesses that resulted in the Company's internal control over financial reporting

- 34 -

and disclosure controls and procedures not being effective as of a prior date. While management continues to evaluate the impacts of the identified control deficiencies, management has concluded that at least one of these material weaknesses existed as of December 31, 2018.

These determinations affect the conclusions regarding effectiveness previously expressed by the Company's management in Part II, Item 9A, "Controls and Procedures" in the Company's Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Annual Report") and Part I, Item 4, "Controls and Procedures" in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2019 (the "First Quarter 10-Q"). Accordingly, investors should no longer rely on management's report on internal control over financial reporting or the internal control over financial reporting opinion of the Company's independent registered public accounting firm included in the 2018 Annual Report. The Company expects to amend the 2018 Annual Report and the First Quarter 10-Q in the future to reflect these conclusions.

The Company also continues to require additional time in order to permit the new members of the Company's management team who are responsible for certifying the accuracy of the Company's financial information and the effectiveness of the Company's disclosure controls and procedures to be in a position to so certify amended, delinquent and future SEC filings.

In addition, the Company's management continues to provide information to its independent registered public accounting firm in order to allow it to evaluate the internal review and associated findings, as well as the Company's proposed remediation plan and the impact that any identified material weaknesses may have on its prior opinions. The Company also expects that management and its independent registered public accounting firm may need to perform additional procedures with respect to historical periods prior to the Company making any amended, delinquent or future SEC filings.

The Company cannot currently predict when this evaluation and review process will be completed, but it does not currently expect to be in a position to file amended, delinquent or future SEC filings prior to the end of 2019. The Company will continue to seek to complete the evaluation and review process, take appropriate corrective actions and make necessary filings with the SEC with a view to becoming current in its filing obligations under the Securities Exchange Act of 1934, as amended, as soon as reasonably practicable.

The Audit Committee identified one related party transaction that was not previously disclosed. During 2018, (i) an entity ("Entity A") that is 50% owned by the Company's former Chief Accounting Officer (the "Former CAO") and 50% by the Former CAO's business partner (who is not affiliated with the Company) loaned approximately $770,000, and (ii) an entity that is owned 100% by the Former CAO ("Entity B") loaned approximately $57,000, to another entity that is owned 100% by the Former CAO's business partner ("Entity C"). The loaned funds were used by Entity C during 2018 to pay for a portion of the acquisition, development, and

construction costs associated with an iron testing facility and a portion of the acquisition and development costs associated with a maintenance facility that were sold or leased to the Company.  The approximately $827,000 of funds loaned by Entity A and Entity B to Entity C were repaid in full by Entity C, without interest.

Similarly, during 2019, Entity A provided approximately $500,000 of funds to Entity C, which funds the Company understands were used during 2019 to pay for a portion of the development and construction costs associated with the iron testing facility.

The Company purchased the iron testing facility from Entity C, reimbursed Entity C for certain development costs associated with the maintenance facility, and leased a property adjacent to the iron testing facility and the maintenance facility property from Entity C.  In total, the Company has paid approximately $3,600,000 to Entity C, which includes $2,300,000 associated with the iron testing facility discussed above.

71.     In the wake of these adverse revelations, the trading price of ProPetro stock collapsed $10 per share, falling to $7.34 per share on November 13, 2019 from $17.34 per share on August 8, 2019, wiping out more than $950 million in once valuable shareholder equity.

## DAMAGES TO THE COMPANY

72.     As a result of defendants' fiduciary failures, ProPetro has suffered, and will continue to suffer, substantial damages, injuries, and losses.  For example, the Company has been named as a primary defendant in a costly and expensive-to-defend class action lawsuit for violations of the federal securities laws pending before the U.S. District Court for the Western District of Texas.  *See Logan v. ProPetro Holding Corp.*, No. 19-cv-00217 (W.D. Tex.).  Further, ProPetro's reputation as a good corporate citizen and its goodwill have been irreparably tarnished.  Further still, ProPetro is the subject of a costly and expensive SEC investigation into the Company's financial disclosures and reporting.

73.     Defendants, however, have not fared nearly so badly.  On the contrary, they have pocketed over $24.8 million in director and executive compensation not justified by ProPetro's performance while under their stewardship.

- 36 -

74.     This notwithstanding, the ProPetro Board has not – and will not – bring legal action against the directors and officers responsible for this debacle.  Therefore, by this action plaintiff seeks to vindicate ProPetro's rights against its wayward fiduciaries.

### DERIVATIVE ALLEGATIONS

75.     Plaintiff incorporates ¶¶1-74.

76.     Plaintiff brings this action for the benefit of ProPetro to redress injuries suffered, and to be suffered, by ProPetro due to defendants' violations of law.  Plaintiff will adequately and fairly represent the interests of ProPetro in enforcing and prosecuting these derivative claims.  ProPetro is named as a nominal defendant in this action.

77.     The ProPetro Board has eight members: defendants Armour, Berg, Best, Blackwell, Douglas, Gobe, Moore and Redman (together, the "ProPetro Board").  A pre-suit demand on the ProPetro Board to commence this action is excused as a futile and useless act for several reasons.

78.     First, defendant Redman is currently employed as Chief Executive Officer of ProPetro, for which he has received and continues to receive substantial monetary compensation and other benefits.  As a result, defendant Redman is incapable of impartially considering a demand to commence and prosecute this action, due to his lack of independence.

79.     Second, defendants Armour, Berg, Best, Blackwell, Douglas, Gobe, Moore and Redman served on the ProPetro Board during and throughout the course of the misconduct described herein. As the "ultimate decision-making body" of the Company, the ProPetro Board caused the Company to adopt ineffective internal controls over disclosure and financial reporting, including over the myriad of related-party transactions recently revealed by the Company.  Defendants' acts and/or omissions are not legally protected business decisions and their misconduct can in no way be considered a valid exercise of business judgment.

80.     Third, defendants Best, Douglas, Moore, and Mitchell served as members of the Audit Committee.  The Company's Audit Committee Charter states that the members of the Audit Committee were and are responsible for, among other things, reviewing the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, and ensuring that the Company is in compliance with applicable laws and regulations.  Defendants Best, Douglas, Moore, and Mitchell and the Audit Committee, among other things, caused and/or permitted the Company to adopt ineffective internal controls over disclosure and financial reporting, including over related-party transactions, which have rendered certain of the Company's previously disseminated financial statements false and misleading such that they should no longer be relied upon.  These actions caused defendants Best, Douglas, Moore, and Mitchell to breach their fiduciary duties and now subject each of them to a substantial likelihood of liability.

81.     Fourth, the acts complained of herein constitute violations of fiduciary duties owed by defendants, and these acts are incapable of ratification.

82.     Fifth, ProPetro has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet defendants Armour, Berg, Best, Blackwell, Douglas, Gobe, Moore and Redman have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ProPetro any part of the damages ProPetro suffered and will continue to suffer.  Thus, any demand upon these defendants would be futile.

83.     Sixth, defendants Armour, Berg, Best, Blackwell, Douglas, Gobe, Moore and Redman's alleged misconduct was not the product of legitimate business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, Armour, Berg, Best, Blackwell, Douglas, Gobe, Moore and Redman cannot claim exculpation from their violations of duty pursuant to the Company's charter.  Defendants Armour, Berg, Best, Blackwell, Douglas, Gobe, Moore and

Redman, and each of them, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein, and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand on the ProPetro Board is excused as futile.

84.     Seventh, defendants Armour, Berg, Best, Blackwell, Douglas, Gobe, Moore and Redman are protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the shareholders of ProPetro. However, most directors' and officers' liability insurance policies contain provisions that eliminate coverage for any action brought directly by a company against the directors and officers, known as the "insured-versus-insured exclusion." As a result, if the defendants were to sue themselves or certain officers of ProPetro, there would be no directors' and officers' insurance protection. Accordingly, defendants Armour, Berg, Best, Blackwell, Douglas, Gobe, Moore and Redman will not sue themselves. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the ProPetro Board is futile and, therefore, excused.

85.     Plaintiff has not made any demand on ProPetro shareholders to institute this action since such demand would be a futile and useless act for the several reasons. First, ProPetro is a publicly traded company with over 100 million shares outstanding held by thousands of individuals and entities spread throughout the country. Second, making demand on such a number of shareholders spread throughout the country would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders. Third, making demand on all

shareholders would force plaintiff to incur significant expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty for Disseminating False and Misleading Information

86.     Plaintiff incorporates ¶¶1-85.

87.     Each of the defendants had a duty to ensure that ProPetro disseminated accurate, truthful, and complete information to its shareholders.

88.     Defendants did not act in good faith or exercise prudent business judgment by causing or allowing the Company to disseminate to ProPetro shareholders materially misleading and inaccurate information through, among other things, SEC filings and other public statements and disclosures as detailed herein.  These actions violated the defendants' duties of care, loyalty, and good faith.

89.     The Company has suffered significant damages as a direct and proximate result of defendants' breaches of fiduciary duties.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty for Failing to Maintain Internal Controls

90.     Plaintiff incorporates ¶¶1-89.

91.     As alleged herein, each of the defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles and take appropriate action to correct any misconduct and prevent its recurrence when put on notice of problems with the Company's business practices and operations.

92.     The Company has sustained damages as a direct and proximate result of defendants' foregoing breaches of fiduciary duties.

## COUNT III

### Against All Defendants for Unjust Enrichment

93.     Plaintiff incorporates ¶¶1-92.

94.     Defendants were unjustly enriched at the expense and to the detriment of ProPetro by their wrongful acts and omissions.

95.     As a shareholder and representative of ProPetro, plaintiff seeks restitution from each of these defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by defendants from their wrongful conduct and breach of fiduciary duties.

## COUNT IV

### Derivatively for Contribution Under §§10(b) and 21D of the Exchange Act Against defendants Armour, Coppedge, Denholm, Herman, Himler, Labbat, Redman and Smith

96.     Plaintiff incorporates ¶¶1-95.

97.     This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants Armour, Coppedge, Denholm, Herman, Himler, Labbat, Redman and Smith, each of whom are named as defendants in the Securities Class Action (the "Securities Class Action Defendants").

98.     ProPetro is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, among other things, violation of §10(b) of the Exchange Act.  If ProPetro is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Securities Class Action Defendants as alleged herein.  The Company is entitled to receive

contribution from those defendants in connection with the Securities Class Action against the Company.

99.     As directors and/or officers of ProPetro, the Securities Class Action Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about ProPetro, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

100.     The Securities Class Action Defendants are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

101.     Accordingly, ProPetro is entitled to all appropriate contribution or indemnification from the Securities Class Action Defendants, who are responsible for exposing ProPetro to liability under the federal securities laws.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.     Awarding money damages against all defendants, jointly and severally, for all damages, injuries, and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

B.      Directing all defendants to account for all damages caused by them and all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, and insider sales proceeds, and imposing a constructive trust thereon;

C.      Directing ProPetro to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

(a)      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(b)      a provision to permit the shareholders of ProPetro to nominate at least two candidates for election to the Board; and

(c)      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

- 43 -

D.      Awarding punitive damages;

E.      Awarding costs and disbursements of this action, including reasonable attorneys',

accountants', and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  January 31, 2020                KENDALL LAW GROUP, PLLC
                                        JOE KENDALL
                                        Bar No. 11260700


                                                    */s/ Joe Kendall*
                                        ─────────────────────────────
                                            JOE KENDALL
                                        3811 Turtle Creek Blvd., Suite 1450
                                        Dallas, TX  75219
                                        Telephone:  214/744-3000 Fax: 214/744-3015
                                        jkendall@kendalllawgroup.com

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        BENNY C. GOODMAN III
                                        ERIK W. LUEDEKE
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101-3301
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)
                                        bennyg@rgrdlaw.com
                                        eluedeke@rgrdlaw.com

                                        SUGARMAN & SUSSKIND, P.A.
                                        ROBERT A. SUGARMAN
                                        PEDRO A. HERRERA
                                        100 Miracle Mile, Suite 300
                                        Coral Gables, FL  33134
                                        Telephone:  305/529-2801
                                        305/447-8115 (fax)
                                        sugarman@sugarmansusskind.com
                                        pherrera@sugarmansusskind.com

                                        Attorneys for Plaintiff

- 44 -